UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VONLEE NICOLE TITLOW,

       Plaintiff,

v.

CORRECTIONAL MEDICAL SERVICES, INC.;
CRAIG HUTCHINSON, M.D.; KEITH IVENS,
M.D.; GREGORY NAYLOR, M.D.; JEFFREY
STIEVE, M.D.; HARESH PANDYA, M.D.;
CRYSTAL RICE; and CRAIG WITHROW,

       Defendants.

_____/

Case No. 07-12083

Honorable John Corbett O'Meara

## OPINION AND ORDER
## GRANTING IN PART AND DENYING IN PART THE CMS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DENYING THE STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND GRANTING SUMMARY JUDGMENT TO DEFENDANTS HUTCHINSON AND CMS

       This matter came before the court on defendants Correctional Medical Services, Hutchinson, and Ivens' (collectively "CMS Defendants") motion for summary judgment and on defendants Stieve, Pandya, Naylor, Rice, and Withrows' (collectively "State Defendants") motion for summary judgment. Plaintiff Vonlee Titlow filed a combined response, and the CMS Defendants filed a reply brief. For the reasons set forth below, the court will grant in part and deny in part the CMS Defendants' motion and will deny the State Defendants' motion.

## BACKGROUND FACTS

       On May 14, 2007, Plaintiff commenced this action by filing a *pro se* civil rights complaint pursuant to 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments, raising several claims against numerous defendants. Following the court's appointment of *pro bono* counsel, Plaintiff filed

a second amended complaint on August 16, 2010. The second amended complaint names as defendants Correctional Medical Services, Inc. (CMS); Dr. Craig Hutchinson, Medical Director of CMS; Dr. Jeffrey Stieve, MDOC Chief Medical Officer; Dr. Keith Ivens, CMS Utilization Management Director; Dr. Haresh Pandya, MDOC Regional Medical Director Dr. Gregory Naylor, Acting Chief Medical Officer of MDOC's Bureau of Health Care Services; and Correctional Officers Crystal Rice and Craig Withrow.[1] Plaintiff claims that Defendants were deliberately indifferent to her medical needs in violation of the Eighth Amendment. Specifically, Plaintiff claims that: (1) Defendants CMS, Hutchinson, Naylor, Stieve, Ivens, and Pandya were deliberately indifferent to her medical needs by failing to approve corrective surgery; and (2) defendants Rice and Withrow were deliberately indifferent to her medical needs when they failed to take her to the hospital at her request.

The basic facts underlying this action are not in dispute. Plaintiff Vonlee Nicole Titlow is a biologically male prisoner who suffers from gender identity disorder. At the times relevant to this complaint, Plaintiff was incarcerated at the Southern Michigan Correctional Facility. Prior to her incarceration,[2] Plaintiff received silicon injection to increase her breast size.[3] It is undisputed, at least at this stage of the case, that sometime in 2003, after her incarceration began, Plaintiff's body

---

[1]Plaintiff's second amended complaint also named as defendants Dennis Straub, George Pramstallar, James Forshee, and Mary Kleinhardt. Plaintiff's claims against these defendants were dismissed upon the consent of the parties on February 7, 2011.

[2]Although biologically male, Plaintiff refers to herself using feminine pronouns. The court will do the same here.

[3]The exact date is not clear from the record, but it appears to predate Plaintiff's incarceration by about 15-20 years. Further, although the parties and the medical records at times refer to Plaintiff's silicone breast "implants," it is clear that Plaintiff did not receive implants but had silicone directly injected into the breast tissue.

2

began to reject the silicone, causing pain, bruising, and scar tissue. Plaintiff also alleges that the diffusion of silicone into her body has caused a number of other maladies. Throughout 2004-2006, Plaintiff's treating doctors recommended that a surgical option for removal of the silicon be explored. These requests were repeatedly been denied by prison officials. Finally, Plaintiff alleges that her requests to be taken to the hospital in April 2006 were ignored by prison guards.

Taken the light most favorable to Plaintiff, the evidence submitted by the parties establishes the following facts. Plaintiff was initially incarcerated at the Riverside Correctional Facility. On April 24, 2002, an initial medical screening noted a hard nodular mass in each breast. A May 15, 2002 intake health appraisal noted the same, indicating that the masses were likely caused by a previous silicone injection. *See* Pl.'s Resp., Exs. 1A. On September 15, 2003, Plaintiff's treating physician spoke with defendant Hutchinson regarding treatment for Plaintiff's GID. Defendant Hutchinson told the treating physician to continue Plaintiff's medication and have her evaluated by a psychologist. *See id.*, Ex. 1B. In December 2004, Plaintiff was transferred to the Southern Michigan Correctional Facility. On December 3, Dr. Keith Camaan noted that Plaintiff reported pain in her breasts and had discoloration accompanied by hard tissue, edema, and painful scarring. Dr. Camaan requested a surgical consultation. The request was denied by then CMS administrator Dr. James Forshee on the grounds that the procedure was considered cosmetic. *See id.*, Ex. 1C. Dr. Camaan again saw Plaintiff on January 7, 2005. At that time, Plaintiff complained of chronic migraines and nausea. Dr. Camaan informed Plaintiff that he was appealing the denial of the request for surgical consult to the Medical Services Appeal Committee (MSAC). On January 25, 2005, the MSAC upheld the denial without explanation. Present at the MSAC meeting were both defendants Hutchinson and Naylor. *See id.*, Ex. 1D. On June 15, 2005, Dr. Camaan again examined Plaintiff,

3

whom officers had found on her bunk in extreme pain.  Dr. Camaan noted that Plaintiff had fibrotic breast tissue due to a reaction to the silicon and pain related to the fibrotic tissue.  Dr. Camaan requested that the matter be referred to the MSAC for a pain management evaluation, while again noting that the best option was for Plaintiff to have the silicon removed from her breasts.  *See id*., Ex. 1E; *see also*, Ex. 1F.  On June 29, 2005, Plaintiff was taken to Duane Waters Hospital for emergency treatment of her severe breast pain.  The treating emergency room physician, Dr. Ajovi Scott-Emuakapor, noted that Plaintiff was in extreme pain and had several abnormalities in each breast.  Dr. Scott-Emuakapor diagnosed mastalgia and noted as a concern the possibility of a secondary infection.  Dr. Scott-Emuakapor also noted that due to the severity of the pain, a surgical consultation was necessary.  Dr. Scott-Emuakapor noted that a mammogram or CT scan was "essential . . . to ascertain if there is an urgency to perform extraction of the foreign body," and that a "[s]urgical referral is strongly recommended."  *Id*., Ex. 1F.

On July 8, 2005, Dr. Faghihnia examined Plaintiff and again noted that Plaintiff had severe pain secondary to fibrotic lesions as a likely result of silicone leakage.  Dr. Faghihnia requested authorization from CMS to prescribe Vicodin.  Dr. Faghihnia made the same findings on August 1 and August 17, and on the latter date again requested authorization to prescribe additional pain medications.  *See id*., Ex. 1G-H.  Plaintiff was examined by Dr. Fatu on November 21, 2005.  Dr. Fatu's findings mirrored those of the previous treating physicians, and Dr. Fatu likewise requested a surgical consultation.  That request was denied by defendant Ivens on November 28, 2005, because "[p]ainful breasts are not generally indications to remove the breast."  *Id*., Ex. 1I.  Plaintiff was again taken to the emergency room due to severe breast pain on February 6, 2006.  The following day, Dr.

4

Fatu submitted another request to prescribe Vicodin, which was ultimately approved.  *See id.*, Ex. 1J.

On February 6, 2007, Plaintiff was seen by staff psychiatrist Dr. Michaela Weller.  Dr. Weller reported that Plaintiff was becoming progressively depressed secondary to her chronic pain issues. Dr. Weller opined that "[a]lthough true that pain is not a general indication for mastectomy, the procedure being asked by the [patient] is not a mastectomy but a removal of a foreign body."  *Id.*, Ex. 1K.  Plaintiff was examined by treating physician's assistant Beverly Sainz on March 5, 2007. P.A. Sainz made findings consistent with the earlier diagnoses and again requested a surgical consult from CMS.  On March 16, Defendant Ivens denied the request for surgical consult, stating:

> Criteria not met.  Not authorized.  General surgery consult for possible leakage of silicon from breast implants.  Silicone implants were removed from the market in 1992. The patient might not have silicone.  Old records would confirm.  The FDA has determined silicone leaks do not lead to increase immune disease or cancer.  According to our records this is a recurrent problem.  Dr. Wisneski [CMS's surgical consultant] was authorized to see the patient for breast inflammation in 2005.  Perhaps that eval. could be reviewed.

*Id.*, Ex. 1L.  Despite this determination, there is no evidence in the record that Dr. Wisneski ever examined Plaintiff, nor is there any evidence that as of March 16, 2007, any of the several requests for a surgical consultation had been approved by CMS.  Further, Plaintiff's pre-incarceration medical records from the Vanderbilt University Medical Center, dated September 20, 1994, had been received by the MDOC as early as November 16, 2003.  *See id.*, Ex. 1B.  Plaintiff was again examined by P.A. Sainz on March 21, 2007.  Sainz noted that she spoke with defendant Ivens, who again told her to review Dr. Wisneski's consult report and to obtain an authorization from Plaintiff to release her medical records.  *See id.*, Ex. 1M.  Plaintiff filed her initial complaint in this action on May 14, 2007.

On August 10, 2007, plaintiff was seen by yet another treating physician, Dr. Suzanne Hawkins. Dr. Hawkins submitted another request for surgical consult, which defendant Ivens denied, stating: "Criteria not met. Not authorized for removal of silicone. Dr. Hawkins, Mr. Titlow has a recurrent history of inflammation in his breast. Review past treatments & you may find a way to help him." *Id.*, Ex. 1N. On September 17, Plaintiff was seen by Dr. Madeline Boyd-Brown for a medication review. Dr. Boyd-Brown likewise submitted a request for surgical consult, noting that more conservative therapies had failed and that "Vicoden-ES does not control pain. Treatment is ultimately to remove foreign objects." A CMS nurse reviewer denied the request on September 20, stating: "Criteria not met. This request has gone thru the CMS process. It is now up to MDOC/[Regional Medical Director] to decide if case moves forward to MSAC committee." *Id.*, Ex. 1O. In response to Dr. Boyd-Brown's appeal of the denial, a nurse reviewer stated that "MSAC may authorize removal of injected silicone lumps but no mammoplasty and that removal of silicone may not resolve all his pain." *Id.* Plaintiff was examined by Dr. Robert Migliorino and nurse Magen Johnson in December 2007, both of whom noted Plaintiff's breast pain and discharge. *See id.* Ex. 1P.

On January 10, 2008, Plaintiff was examined by Dr. Robert Crompton. Dr. Compton informed Plaintiff that he would follow up on Plaintiff's request for an appeal to the MSAC. In his appeal submitted to defendant Stieve, Dr. Compton noted that a surgical consultation had never been performed. *See id.*, Ex. 1Q. On November 5, 2008, Plaintiff spoke with nurse Ann Karp, who confirmed that Plaintiff had received silicon injections, not implants. Nurse Karp also noted that the record contained no decision of the MSAC on Plaintiff's appeal. On November 7, Nurse Karp took photographs of Plaintiff's breasts which she forwarded to the Regional Medical Officer. *See*

6

*id.*, Ex. 1R.  On November 18, the MSAC denied Dr. Crompton's appeal of the denial of a surgical consultation.  *See id.*  On December 2, Dr. Scott Holmes requested additional pain medications for Plaintiff.  Dr. Holmes resubmitted the request on January 16, 2009, having received no response to his initial request.  On April 1, 2009, the request was approved.  *See id.*, Ex. 1S.

Meanwhile, on March 9, 2009, Plaintiff was seen by two nurses for complaints of pain and bloody discharge from her right breast.  Plaintiff was taken to Ionia County Hospital, where she was treated for acute mastitis.  *See id.*, Ex. 1T.  On March 12, Plaintiff spoke with Barbara Zahn, informing her that she did not expect MDOC to replace the silicone with breast implants and that she just wanted the silicone removed so that she could be pain free.  *See id.*  On March 11, 2009, Dr. Michael J. Busuito, Plaintiff's retained expert, prepared a report based on his review of Plaintiff's medical records.  Dr. Busuito opined that, based on the assumptions that Plaintiff had direct silicone injections and was in fact experiencing pain and inflammation, "it is absolutely indicated that [Plaintiff] be given a surgical consult and from my review of the records and my understanding of the case it would be my recommendation that this patient undergo bilateral mastectomies."  Dr. Busuito further opined that if injected silicone were present in Plaintiff's breasts and not removed, Plaintiff "will have progression of his chronic mastitis with inflammation, pain, discomfort and chronic infections."  Although based on disagreement in the medical community Dr. Busuito could not attribute Plaintiff's systemic symptoms (such as headaches and joint pain) to the presence of silicone, he could "certainly attribute his complaints of chronic pain and discomfort in his breasts along with the problem of chronic infection to the presence of injected silicone in his breasts."  *Id.*, Ex. 1U.

On May 26, 2009, defendant Stieve notified Dr. Compton that surgical removal of the silicone had been approved.  On May 28, Defendant Pandya personally delivered the news to Plaintiff.  *See id.*, Ex. 1V.  On July 1, 2009, Plaintiff was seen by Dr. Kevin O'Connor for a surgical consultation. Dr. O'Connor recommended a mastectomy.  On April 7, 2010, Dr. O'Connor recommended removal of Plaintiff's right breast, as that was the one causing the majority of symptoms.  The mastectomy was performed on June 3, 2010.  *See id.*, Ex. 1W.

Plaintiff's claims against defendants Rice and Withrow do not relate to the more general failure to provide her with treatment for her breast condition.  Rather, she contends that these defendants, who are guards and not medical providers, ignored his complaints of pain on one particular occasion. Specifically, Plaintiff contends that in the early morning hours of April 14, 2006, she was experiencing severe breast and head pain.  She asked defendant Withrow to be taken to the hospital. According to Plaintiff, defendant Withrow answered in a mocking tone that he would try to call but doubted that the hospital would see her and then walked away.  *See id.*, Ex. 9, ¶¶ 3-4; Ex. 14, at 57-58.  Later, Plaintiff asked defendant Rice if defendant Withrow had called medical services or the hospital, but defendant Rice shrugged and walked away.  *See id.* Ex. 9, ¶¶ 6-7, Ex. 14, at 58.  When the first shift officers came on duty, Plaintiff was able to explain the problem to Corrections Officer Newbecker.  Newbecker contacted health care services, and Plaintiff was administered Vicodin.  *See id*, Ex. 9, ¶¶ 11, 13; Ex. 14, at 58-59.  Newbecker informed Plaintiff that neither defendant had documented a request for medical assistance in the log book.  *See id.*, Ex. 9, ¶ 12.  The following night, Plaintiff again began to experience severe pain as well as vomiting.  Plaintiff asked defendant Rice to contact health care.  According to Plaintiff, defendant Rice told her that she was too busy

and walked away.  Plaintiff was again able to secure medical attention after the shift change.  *See*

*id*., Ex. 9, ¶¶ 14-15; Ex. 14, at 65-66, 67-68.

## LAW AND ANALYSIS

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue of material fact and that the moving party is

entitled to judgment as a matter of law.  FED. R. CIV. P. 56.  "An issue of fact is 'genuine' if the

evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Hedrick*

*v. Western Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004) (citing *Anderson v. Liberty Lobby,*

*Inc*., 477 U.S. 242, 248 (1986)).  "A fact is material only if its resolution will affect the outcome of

the lawsuit."  *Hedrick*, 355 F.3d at 451-52 (citing *Anderson*, 477 U.S. at 248).  In deciding a motion

for summary judgment, the court must view the evidence in a light most favorable to the non-movant

as well as draw all reasonable inferences in the non-movant's favor.  *See Sutherland v. Michigan*

*Dep't of Treasury*, 344 F.3d 603, 613 (6th Cir. 2003); *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir.

2003).

"The moving party has the initial burden of showing the absence of a genuine issue of material

fact as to an essential element of the non-moving party's case."  *Hedrick*, 355 F.3d at 451 (citing

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  To meet this burden, the moving party need

not produce evidence showing the absence of a genuine issue of material fact.  Rather, "the burden

on the moving party may be discharged by 'showing' -- that is, pointing out to the district court --

that there is an absence of evidence to support the non-moving party's case."  *Celotex Corp.*, 477

U.S. at 325.  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party

to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

To create a genuine issue of material fact, however, the non-movant must do more than present some evidence on a disputed issue.  As the Supreme Court has explained:

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to  return a verdict for that party.  If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Anderson*, 477 U.S. at 249-50. (citations omitted); *see Celotex Corp.*, 477 U.S. at 322-23; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  Thus, "[t]he existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Sutherland*, 344 F.3d at 613.

To state a viable § 1983 claim, a plaintiff must allege that: (1) he was deprived of a right, privilege, or immunity secured by the Federal Constitution or the laws of the United States; and (2) the deprivation was caused by a person while acting under color of state law. *Doe v. Wigginton*, 21 F.3d 733, 738 (6th Cir. 1994).  Thus, "[t]he first step in any such claim is to identify the specific constitutional [or statutory] right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (plurality op.); *see also*, *Graham v. Connor*, 490 U.S. 386, 394 (1989).  Here, Plaintiff alleges that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment.

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. Amend. VIII.  In its purest sense, the Eighth Amendment proscribes cruel and unusual punishment meted out in a penal or

disciplinary sense.  In its application by the courts, the Amendment actually protects a wide assortment of interests.  It proscribes disproportionate punishments, *Weems v. United States*, 217 U.S. 349, 366-67 (1910), "unnecessary and wanton infliction of pain," *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (plurality opinion), and conduct repugnant to "evolving standards of decency," *Trop v. Dulles*, 356 U.S. 86 (1958) (plurality opinion).  *See generally, Parrish v. Johnson*, 800 F.2d 600, 609 (6th Cir. 1986).  The Constitution "does not mandate comfortable prisons."  *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981).  On the other hand, it does not permit inhumane ones, and it is clear that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  *Helling v. McKinney*, 509 U.S. 25, 31 (1993); *see also, Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  The amendment imposes affirmative duties on prison officials,

> who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'

*Id*. (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

If the offending conduct is not a criminal penalty, then it must reflect an "'unnecessary and wanton infliction of pain'" to come within Eighth Amendment's prohibition on cruel and unusual punishment.  *Ingraham v. Wright*, 430 U.S. 651, 670 (1977) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  Such claims must satisfy both an objective and a subjective test.  *Farmer*, 511 U.S. at 834; *Wilson v. Seiter*, 501 U.S. 294, 297-300 (1991).  Under this analysis, what constitutes "unnecessary and wanton infliction of pain" will vary depending on the nature of the alleged constitutional violation.  *Hudson v. McMillian*, 503 U.S. 1, 5 (1992); *Brooks v. Celeste*, 39 F.3d 125,

11

128 (6th Cir. 1994). The plaintiff bears the burden of proving these elements by a preponderance of the evidence. *Brooks*, 39 F.3d at 127-28.

The objective prong asks whether the harm inflicted by the conduct is sufficiently serious to warrant Eighth Amendment protection. *McMillian*, 503 U.S. at 8-9; *Rhodes*, 452 U.S. at 349 (1981). To satisfy this prong, the conduct must deprive the plaintiff of "the minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 349. The objective component is contextually driven and is responsive to "'contemporary standards of decency.'" *McMillian*, 503 U.S. at 8 (quoting *Estelle*, 429 U.S. at 103). The subjective prong asks whether the officials acted with a sufficiently culpable state of mind; that is, was the conduct "wanton." *Wilson*, 501 U.S. at 302; *Moore v. Holbrook*, 2 F.3d 697, 700 (6th Cir. 1993). In determining whether an official acted wantonly, the court applies a "deliberate indifference" standard. *Wilson*, 501 U.S. at 302-03; *see Estelle*, 429 U.S. at 104-06. Under this "deliberate indifference" standard,

> a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.

*Farmer*, 511 U.S. at 847. A prison official is not free to ignore obvious dangers to inmates and may be liable even if he does not know the exact nature of the harm that may befall a particular inmate. *Id*. at 843-44. However, prison officials may escape liability if they show that they in fact did not know of the obvious risk to the inmate's health or safety, or knowing of it, they acted reasonably under the circumstances. *Id*. at 844-45. Plaintiff's claims that defendants denied medically necessary treatment are governed by these objective and subjective tests, as explained by the Supreme Court in *Estelle*, *supra*. In *Estelle*, the Court held that "[r]egardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983."

12

*Estelle*, 429 U.S. at 105. Thus, a court faced with failure to treat claims has a two-fold inquiry: (1) does the plaintiff's complaint involve "serious illness or injury"?–*i.e*, the objective prong of the Eighth Amendment analysis; and (2) if so, were the defendants deliberately indifferent to this serious illness or injury?–*i.e.*, the subjective prong of the Eighth Amendment analysis. *See generally*, *Durham v. Nu'Man*, 97 F.3d 862, 868-69 (6th Cir. 1996). Importantly, however, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106.

Further, it is well established that liability in a § 1983 action cannot be based on a theory of *respondeat superior*. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1948 (2009); *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 691 (1978). "To recover damages under 42 U.S.C. § 1983, a plaintiff must establish a defendant's personal responsibility for the claimed deprivation of a constitutional right." *Diebitz v. Arreola*, 834 F. Supp. 298, 304 (E.D. Wis. 1993). "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own conduct, has violated the Constitution." *Iqbal*, 129 S. Ct. at 1948. In other words, in order to state a claim under § 1983 "[a] plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights. Liability under § 1983 must be based on the personal involvement of the defendant." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998) (per curiam); *see also*, *Carr v. Parker*, No. 98-6395, 1999 WL 1206879, at *1 (6th Cir. Dec. 9, 1999); *Salehpour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir. 1998). As the Sixth Circuit has stated:

> 'Section 1983 liability will not be imposed solely upon the basis of respondeat superior.
> There must be a showing that the supervisor encouraged the specific incident of

> misconduct or in some other way directly participated in it. *At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.*'

*Taylor v. Michigan Dep't of Corrections*, 69 F.3d 73, 81 (6th Cir. 1995) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984) (emphasis added)) (emphasis by *Taylor* court); *see also, Monell*, 436 U.S. at 693-95; *Birell v. Brown*, 867 F.2d 956, 959 (6th Cir. 1989).  Furthermore, an allegation that a supervisor was aware of an actionable wrong committed by a subordinate and failed to take corrective action "is insufficient to impose liability on supervisory personnel under § 1983." *Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988).  As the *Haydon* court stated: "A supervisory official's failure to control, or train the offending individual is not actionable, unless the supervisor 'either encouraged the specific incident or in some other way directly participated in it.'" *Haydon*, 853 F.2d at 429 (quoting *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982)).

The State Defendants argue that they are entitled to summary judgment because they were not directly involved in providing medical care to Plaintiff nor did they supervise those who provided such care, and because Plaintiff's claim does not involve deliberate indifference but rather a difference of medical judgment between doctors.  Further, the State Defendants argue that Plaintiff's claims against defendants Rice and Withrow fail because these defendants were not deliberately indifferent to a serious medical need.  The CMS Defendants argue that they are entitled to summary judgment because there is no evidence that they were deliberately indifferent to Plaintiff's breast condition and because they were not authorized to approve the reconstructive surgery that Plaintiff sought.  They further contend that CMS itself is entitled to summary judgment because there is no evidence that CMS maintained an unconstitutional policy or custom which caused the alleged constitutional violations.

14

At the outset, the court concludes that there is sufficient evidence from which a rational jury could conclude that defendants, in the aggregate, were deliberately indifferent to Plaintiff's serious medical needs.[4]  With respect to the objective prong, a serious medical need is nothing more than a medical need "'that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Perez v. Oakland County*, 466 F.3d 416, 423 (6th Cir. 2006) (quoting *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2004)).  Here, the evidence shows that Plaintiff had a medical condition which resulted in severe pain, hardening of the breast tissue, and possible related maladies such as headaches and joint pain due to the diffusion of silicone.  This severe, long-term pain, which each of Plaintiff's treating physicians determined required treatment, constitutes a serious medical need.  *See Mata v. Saiz*, 427 F.3d 745, 754-55 (10th Cir. 2005); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).

The CMS defendants, relying on *Napier v. Madison County, Kentucky*, 238 F.3d 739 (6th Cir. 2001), argue that Plaintiff cannot show a serious medical need under the objective prong because she was eventually provided treatment and cannot point to any evidence that the delay in treatment had any detrimental effects.  In *Napier*, the Sixth Circuit explained that "an inmate who complains that [a] delay in medical treatment rose to a constitutional violation, must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Napier v. Madison County, Ky.*, 238 F.3d 739, 742 (6th Cir. 2001) (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994)).  This argument is without merit for two

---

[4]The court's discussion here deals with the claims involving the surgical consultation issue. Plaintiff's claims against defendants Rice and Withrow are discussed below.

reasons.  First, "*Napier*'s medical verification requirement has since been restricted to those cases involving 'minor maladies.'"  *Lyons v. United States*, No. 4:03CV1620, 2009 WL 997300, at *12 (N.D. Ohio Apr. 14, 2009) (citing *Blackmore*, 390 F.3d at 898; *Cain v. Irvin*, 286 Fed. Appx. 920, 926 (6th Cir. 2008)); *see also*, *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311-12 (6th Cir. 2005).  Second, Plaintiff's evidence satisfies the *Napier* standard.  Here, plaintiff has presented abundant objective evidence, through the prison medical records and the report of her expert, that she had a medical condition that could cause the pain she experienced; and significant pain constitutes a "detrimental effect" under *Napier*.  *See Scott v. Antonini*, 764 F. Supp. 2d 904, 908-09 (E.D. Mich. 2011) (Battani, J.).

Turning to the subjective prong of the Eighth Amendment standard, there is ample evidence in the record to establish that the repeated denial of a surgical consultation amounted to deliberate indifference to Plaintiff's medical needs.  Although the State Defendants characterize the denial of surgery as a simple matter of medical disagreement between the treating physicians and the medical administrators over the proper course of treatment, there is sufficient evidence in the record from which a rational jury could conclude that the decisions to deny surgery, or even a surgical consultation, were not medical treatment decisions.  As recounted above, every doctor or physician's assistant–numbering at least seven–who actually examined and treated Plaintiff determined that a surgical consultation was necessary.  This included medical providers both at the prisons and at outside hospitals.  Moreover, there is evidence in the record to suggest that the decisions to deny surgery were not based on a medical determination that it was not an appropriate treatment for Plaintiff's specific medical needs.  Rather, the record reflects that the decisions were based on generalities having nothing to do with the actual condition of Plaintiff, such as that the request was

16

"considered cosmetic" or that "painful breasts are not generally indications" to amputate the breast. These denials by health administrators who did not treat Plaintiff, at least when viewed in the light most favorable to Plaintiff, reflect an administrative decision divorced from the specific circumstances of Plaintiff's condition rather than a medical treatment decision with which Plaintiff simply disagrees. It is well established that deliberate indifference may be shown were prison officials "deliberately ignore the express orders of a prisoner's prior physician for reasons unrelated to the medical needs of the prisoner." *Hamilton v. Endell*, 981 F.2d 1062, 1066 (9th Cir. 1992); *see also*, *Johnson v. Wright*, 412 F.3d 398, 404-05 (2d Cir. 2005).

In short, Plaintiff repeatedly and continually complained of severe pain in her breasts and asked that the silicon be surgically removed. Her treating physicians have unanimously supported her requests and provided medical justification for the request. Plaintiff's evidence is sufficient to raise a genuine issue of material fact with respect to whether Defendants, in the aggregate, reached a contrary administrative as opposed to medical conclusion based on Plaintiff's unique condition. In these circumstances, Plaintiff has presented sufficient evidence of deliberate indifference to withstand summary judgment. *See Johnson*, 412 F.3d at 404-05; *Goldyn v. Angelone*, No. 97-17185, 1999 WL 728561, at *1 (9th Cir. Sept. 13, 1999) (defendants were not entitled to summary judgment on deliberate indifference claims where plaintiff's "evidence that she complained of pain and asked to have her implants removed, and that prison officials waited almost two years before doing so is sufficient to withstand summary judgment.").

The State Defendants argue that they did not exhibit deliberate indifference because the response to the requests for a surgical consultation--"that amputation is not the preferred [initial] therapy for a painful body part, but the last resort--even to a lay person sounds reasonable." State

17

Def.s' Br. at 14.  This argument is without merit for several reasons.  First, even if this was true at the time of the first request, it does not explain the repeated failure to approve a surgical consultation after several years of more conservative therapy had failed to alleviate Plaintiff's condition and the treating physicians repeatedly advised that surgery, or at least a surgical consultation, was the best course of treatment.  Second, while amputation may not be the preferred initial treatment for a painful body part in general, this does not explain the failure to provide even a consultation to determine whether surgery might be the proper course of treatment in Plaintiff's case.  The explanation further fails to account for the fact that Plaintiff experienced not only pain but also objective symptoms such as the presence of hardening, lumps, and discharge from the nipples.  Third, there is sufficient evidence in the record to raise a factual question as to whether the explanation now offered by Defendants was, in fact, the basis on which the request for a surgical consultation was denied.  The only time that Defendants relied on this explanation was in their denial of Dr. Fatu's 2005 request for a surgical consultation.  *See* Pl.'s Br., Ex. 1I.  In response to Dr. Camaan's 2005 request, however, Dr. Forshee stated that the request was denied because the procedure was considered cosmetic; and on appeal that decision was upheld without explanation. *See id.*, Ex. 1C-D.  The 2007 request by P.A. Sainz was denied on the basis that Plaintiff "might not have silicone"; and Sainz was instructed to obtain an authorization for release of Plaintiff's medical records and to review the consultation performed by Dr. Wisneski, despite the facts that the MDOC had received Plaintiff's medical records as early as 2003 and Dr. Wisneski had never performed a consultation, all prior requests for such a consultation having been denied.  *See id.*, Ex. 1L-M.  In response to Dr. Hawkins's 2007 request, Dr. Hawkins was instructed merely to review Plaintiff's treatment history "and you may find a way to help him."  *Id.*, Ex. 1N.  In response to Dr. Boyd-

18

Brown's later request in 2007, the CMS reviewer did not offer any further explanation but merely passed the buck to the MSAC.  Furthermore, in response to Dr. Crompton's 2008 request, the request was denied without explanation.  *See id.*, Ex. 1R.  In short, there is significant evidence in the record to raise a genuine issue of material fact as to whether both Defendants' current explanation for the denials was the real reason for those denials, and if so whether Defendants nevertheless exhibited deliberate indifference by relying on this reason in light of the circumstances of Plaintiff's medical condition.

The more difficult question is whether each individual Defendant was personally involved or was personally deliberately indifferent to Plaintiff's serious medical needs such that they can each be held individually liable.  With respect to defendant Hutchinson, the court agrees with Defendants that Plaintiff has failed to provide sufficient evidence to establish that defendant Hutchinson was himself deliberately indifferent to Plaintiff's serious medical needs.  The only evidence of defendant Hutchinson's involvement with Plaintiff's medical care is his initial 2003 consultation regarding the treatment of Plaintiff's GID and his sitting on the MSAC for the initial 2005 denial of a consultation.  Defendant Hutchinson did not have any involvement in the other MSAC meetings, *see* CMS Def.s' Br., Ex. B, Dep. of Craig Hutchinson, at 51, nor is there any evidence that defendant Hutchinson had any other involvement in the decisions that are the subject of Plaintiff's suit.  At the time of the 2005 denial it cannot be said that the MSAC's failure to approve a surgical consultation amounted to deliberate indifference.  As of that time, it was plausible for the MSAC to conclude that conservative treatment options should first be explored or that more information was necessary to make an informed decision.  It cannot be said that the 2005 decision, standing alone, amounts to deliberate indifference.  The only other basis for holding Defendant Hutchinson liable that Plaintiff relies on

19

is that Hutchinson was responsible for the hiring and firing of providers contracted by CMS and was responsible for overseeing the delivery of medical care to prisoners. These arguments, however, merely seek to hold defendant Hutchinson liable on the basis of *respondeat superior*, which as explained above is an insufficient basis for holding him personally liable.

Similarly, the court concludes that Plaintiff has failed to establish that defendant CMS is liable for the alleged constitutional violations. In the context of a municipality, a plaintiff cannot establish the municipality's liability unless she shows that "deliberate action attributable to the municipality directly caused a deprivation of federal rights." *Board of County Comm'rs v. Brown*, 520 U.S. 397, 415 (1997). This rule of municipal liability applies equally to private corporations that are deemed state actors for purposes of § 1983. *See Street v. Corrections Corp. of Am.*, 102 F.3d 810, 817-18 (6th Cir. 1996); *see also*, *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (citing cases); *Dashley v. Correctional Med. Servs., Inc.*, 345 F. Supp. 1018, 1021 (E.D. Mo. 2004). Thus, "CMS, although clearly a state actor and therefore a proper party to this § 1983 action, cannot be held vicariously liable for the actions of its agents . . . . Hence, CMS's liability must . . . be premised on some policy that caused a deprivation of [plaintiff]'s Eighth Amendment rights." *Starcher v. Correctional Medical Systems, Inc.*, 7 Fed. Appx. 459, 465 (6th Cir. 2001).

Plaintiff does not point to any specific policy or custom of CMS that resulted in the alleged constitutional violations. Rather, Plaintiff contends that CMS is liable for defendants Hutchinson and Ivens's constitutional violations because they were policymakers. Although, as noted above, the acts of municipal employee may not be attributed to a municipality solely on the basis of *respondeat superior*, the Supreme Court has recognized that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur v. City*

20

*of Cincinnati*, 475 U.S. 469, 480 (1986).  In particular, the municipality may be held liable where the official has final policymaking authority with respect to the act taken or decision made.  *See Jett v. Dallas Independent Sch. Dist.*, 491 U.S. 701, 737 (1989); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality); *Pembaur*, 475 U.S. at 480.  Here, however, there is insufficient evidence to raise a genuine issue of material fact with respect to whether defendant Hutchinson or Ivens had final policymaking authority with respect to the treatment decisions that are at issue in this case.  Defendant Hutchinson, although CMS's regional director, was subject to corporate supervision; and there is no evidence that he was granted policymaking authority by CMS.  *See* CMS Def.s' Br., Ex. B., Dep. of Craig Hutchinson, at 11.  Further, Hutchinson's supervision of the provision of medical care was conducted under the guidance of MDOC regulations and was ultimately subject to review by the MSAC.  In these circumstances, neither defendant Hutchinson nor defendant Ivens was a policymaking official such that CMS may be held directly liable for their actions.  *Cf. Camp v. Correctional Medical Servs., Inc.*, 668 F. Supp. 2d 1338, 1352 (M.D. Ala. 2009), *aff'd*, 400 Fed. Appx. 519 (11th Cir. 2010); *Francis v. Carroll*, 659 F. Supp. 2d 619, 628 (D. Del. 2009).

The same conclusion, however, cannot be reached with respect to the remaining defendants. Defendant Ivens was directly involved in each of the requested denials of a surgical consult. Further, there is sufficient evidence to raise a genuine issue of material fact with respect to whether defendant Ivens actually knew of Plaintiff's medical condition and the repeated requests for a surgical consultation by each of Plaintiff's medical providers.  Likewise, defendants Stieve, Pandya, and Naylor were each involved in the subsequent MSAC process which repeatedly denied the requests of Plaintiff's treating physicians for a surgical consult despite a medical record which provided objective indications of Plaintiff's condition and the repeated requests for a surgical

consultation by Plaintiff's treating providers.  As explained above, there is sufficient evidence in the record to raise a genuine issue of material fact with respect to whether those denials amounted to deliberate indifference to Plaintiff's serious medical needs.  Because defendants Ivens, Stieve, Pandya, and Naylor were directly involved in those denials, they are not entitled to summary judgment.

The court also rejects the State Defendants' argument that they are entitled to qualified immunity.  "Under § 1983 . . . , a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights.  But to ensure that fear of liability will not unduly inhibit officials in the discharge of their duties, the officials may claim qualified immunity; so long as they have not violated a clearly established right, they are shielded from personal liability." *Camreta v. Greene*, 131 S. Ct. 2020, 2030-31 (2011) (internal quotations and citations omitted). "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, ___, 129 S. Ct. 808, 815 (2009).  Thus, "[q]ualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam).  The inquiry into whether a particular right is clearly established "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  However, it is not necessary that "the very action in question has previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation omitted).  Rather, what is required is that "in light of pre-existing law the unlawfulness . . . be apparent." *Id.* (internal

22

quotation omitted).  "[A]n action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs."  *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (citing *Hope*, 536 U.S. at 740-41); *see also*, *Grawey v. Drury*, 567 F.3d 302, 313-14 (6th Cir. 2009).

Here, the State Defendants argue that they are entitled to qualified immunity because "[t]here are no decisions from the U.S. Supreme Court, the Sixth Circuit, this Circuit's District Courts, or neighboring Circuits that clearly establish that refusal to amputate a painful body part before attempting other, more conservative measures, in treating the pain constitutes deliberate indifference." State Def.s' Br., at 14.  This argument fails, for two reasons.  First, Defendants parse too finely the right asserted here.  As noted above, it is not necessary that the very conduct in question has been held unlawful for a right to be clearly established.  As the discussion of the merits of Plaintiff's claims shows, it is clearly established that a prisoner has a right to adequate medical care; and it is equally well-established that prison officials' failure to follow the recommendations of a prisoner's treating physician's for non-medical reasons can constitute deliberate indifference. The State Defendants do not contend that these principles are not clearly established.  Second, Defendants' argument is dependent upon their view of the facts--*i.e.*, that what is involved here is a simple failure to authorize amputation as a first course of treatment for a painful body part. However, as discussed in this opinion, taken in the light most favorable to Plaintiff, the evidence shows Defendants continued to deny a surgical consultation even after years of more conservative treatment had failed to alleviate Plaintiff's symptoms, that Plaintiff had objective medical problems apart from pain, and that the now-proffered basis for the denials of a surgical consultation may not have been the real reasons for Defendants' actions.  At the summary judgment stage, any subsidiary

facts are viewed in the light most favorable to the plaintiff; and the question of whether the officer violated clearly established law is determined by reference to the facts as so viewed. *See Champion*, 380 F.3d at 900 ("[W]here the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability."); *Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir. 1988). In other words, "the nonmoving party is given the benefit of all relevant inferences at the summary judgment stage, and if a genuine dispute exists concerning predicate facts material to the qualified immunity issue, the defendant is not entitled to summary judgment on that ground." *Smithson v. Aldrich*, 235 F.3d 1058, 1061 (8th Cir. 2000) (internal quotation omitted); *cf. Crawford-El v. Britton*, 523 U.S. 574, 598 (1998) (in resolving qualified immunity issue at the pleading stage, "the court must determine whether, assuming the truth of the plaintiff's allegations, the official's conduct violated clearly established law."). Because the facts taken in the light most favorable to the Plaintiff demonstrate that Defendants violated Plaintiff's clearly established constitutional rights, Defendants are not entitled to summary judgment on the basis of qualified immunity.

Finally, with respect to his claims against defendants Rice and Withrow, Plaintiff has presented sufficient evidence to raise a genuine issue of material fact. Plaintiff avers in her affidavit and testified at her deposition that she was in unbearable pain that was obvious to Defendants. She also testified that notwithstanding this pain, both defendants were indifferent to her condition, failed to seek medical attention for her, and failed to document her requests for medical care. These allegations, if true, are sufficient to demonstrate deliberate indifference. *See Estelle*, 429 U.S. at 104-05 (deliberate indifference may be manifested by "prison guards in intentionally denying or delaying access to medical care."). To be sure, defendants Rice and Withrow present a different

24

version of events than Plaintiff, claiming that she complained only of a headache, refused their offer

to see a nurse, and was able to go back to sleep.  This presents a credibility contest which may not

be resolved on summary judgment.  For purposes of this motion, the court must accept Plaintiff's

version of events as sworn to in her affidavit and as to which she testified in her deposition.

Accordingly, defendants Rice and Withrow are not entitled to summary judgment.

## <u>ORDER</u>

It is hereby **ORDERED** that the CMS Defendants' motion for summary judgment is

**GRANTED** with respect to Plaintiff's claims against defendants Hutchinson and CMS and **DENIED**

with respect to Plaintiff's claims against defendant Ivens.

It is further **ORDERED** that the State Defendants' motion for summary judgment is **DENIED.**


<u>s/John Corbett O'Meara</u>
United States District Judge

Date:  November 8, 2011


I hereby certify that a copy of the foregoing document was served upon counsel of record on
this date, November 8, 2011, using the ECF system.


<u>s/William Barkholz</u>
Case Manager

25